UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PROPHET PHILLIPS,

               Petitioner,

                                      CASE NO. 2:10-CV-14139

v.                                JUDGE GEORGE CARAM STEEH
                                   MAGISTRATE JUDGE PAUL J. KOMIVES

JEFFREY WOODS,

               Respondent.[1]

_____/

## REPORT AND RECOMMENDATION ON: (1) PETITIONER'S HABEAS APPLICATION (docket #1); (2) PETITIONER'S MOTION TO REMAND FOR AN EVIDENTIARY HEARING (docket #11); and (3) PETITIONER'S MOTION TO VACATE AND SET ASIDE JUDGMENT (docket #12)

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     C.    *Concurrent Sentencing Doctrine* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     E.    *Sufficiency of the Evidence/Innocence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           1.    *Bind Over* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
           2.    *Sufficiency of the Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                   a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                   b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           3.    *Innocence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     F.    *Notice of the Charges* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                   a. Aiding and Abetting Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                   b. Firearms Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     G.    *Sentencing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     H.    *Evidentiary Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     I.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     J.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

_____

    [1]By Order entered this date, Jeffrey Woods has been substituted in place of Lloyd Rapelje as the proper respondent in this action.

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus, as well as his motions to vacate and set aside judgment and for evidentiary hearing. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.     *Procedural History*

1.     Petitioner Prophet Phillips is a state prisoner, currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan.

2.     On January 29, 2008, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317; carrying a concealed weapon (CCW), MICH. COMP. LAWS § 750.227; being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Saginaw County Circuit Court.  On February 28, 2008, he was sentenced to concurrent terms of 60-90 years' imprisonment each on the murder, CCW, and felon-in-possession convictions, and to a term of two years' imprisonment on the felony-firearm conviction, to be served consecutive to the felon-in-possession conviction.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

   I.     WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO QUASH THE INFORMATION AFTER THE MATTER WAS BOUND OVER TO TRIAL FROM DISTRICT COURT.

   II.    WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR DIRECTED VERDICT OF ACQUITTAL WHERE THE EVIDENCE PRESENTED AT TRIAL BY THE

2

PROSECUTION LACKED ANY ELEMENTS OF THE CRIME OF 2ND DEGREE MURDER.

III.    WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S OBJECTIONS TO THE SCORING OF SENTENCING GUIDELINES OV #1 & #2 WHICH WOULD HAVE RESULTED IN A LOWER GUIDELINE SCORE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Phillips*, No. 284677, 2009 WL 3049727 (Mich. Ct. App. Sept. 24, 2009) (per curiam).[2]

4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Phillips*, 485 Mich. 1083, 777 N.W.2d 191 (2010).

5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on October 15, 2010. Petitioner also filed a supplemental petition on November 19, 2010. Both the initial and supplemental petitions appear to raise only his sufficiency of the evidence claim relating to the second degree murder conviction.

6.    Respondent filed his answer on April 21, 2010. Construing the petition as raising only the sufficiency of the evidence claim, respondent contends that the Court should not review the claim under the concurrent sentencing doctrine, and that the claim is without merit.

7.    Petitioner filed a reply to respondent's answer on June 8, 2011. In his reply, petitioner contends that it was his intention to raise each of the three claims that he raised in the state courts. Petitioner also asserts in his reply that he lacked notice of the charges against him, and that

---

[2]Petitioner also apparently attempted to file a supplemental *pro se* brief in the Michigan Court of Appeals, but that brief was rejected without filing.

3

he is actually innocent of the crimes for which he was convicted.  On the same date, petitioner also

filed a motion to vacate and set aside judgment, in which he more fully argues that he lacked notice

of the charges against him.  Finally, on the same date, petitioner filed a motion for evidentiary

hearing.[3]

B.      *Factual Background Underlying Petitioner's Conviction*

        Petitioner's conviction arises out of the shooting death of Darnell Eiland.  Petitioner was

charged along with Donald Isom, but tried in a separate trial.  The voluminous evidence presented

at trial is accurately summarized in the prosecutor's brief in the Michigan Court of Appeals, as

recounted in respondent's answer:

> At Petitioner's trial, Jamarr Bates testified that he was a friend of murder
> victim Darnell Eiland. (T 1/17/08, 62-64). Eiland lived on Beechwood Street, a few
> miles away from North 9th Street. (T 1/17/08, 62, 64). Bates was also a friend of
> Nathaniel Smith, nicknamed "Black Nate." (T 1/17/08, 64, 68, 97-98). A house on
> North 9th Street in Saginaw, Michigan was owned by Smith's sister. (T 1/17/08, 64).
> Although no one lived there and it had no running water or heat, it had electricity and
> Bates, Eiland and Smith had hung out there for about three months. (T 1/17/08, 64-
> 65, 98-99).
>
> On Friday, August 25, 2006, Bates, Eiland and Smith were there. (T 1/17/08,
> 67, 100-101). Bates and Eiland were there earlier in the day for a minute and, then,
> left, returning at 8 p.m. (T 1/17/08, 99-100).
>
> On that same Friday night, Petitioner and Vanessa Parker, whom he called
> "Auntie," were playing Casino when Petitioner said that he was going home to see
> if his mother was back from work and if he could get into her house. (T 1/17/08, 40-

---

[3]Because petitioner is proceeding *pro se*, I address each of the claims raised in the state courts and
asserted in petitioner's reply and motion to vacate.  As explained below, these claims are without merit.
Although petitioner does not appear to have exhausted his claims regarding notice of the charges in the
state court, the Court may dismiss unexhausted claims on the merits to avoid needless waste of state
judicial resources.  *See* 28 U.S.C. § 2254(b)(2).  In his answer to the petition, respondent requests the
opportunity to supplement his answer if the Court construes the petition as raising claims beyond the
sufficiency of the evidence claim asserted in the initial petition.  Because, as explained below, the claims
are meritless, further briefing from respondent is not necessary.  However, because respondent has not
had an opportunity to address these claims, if the Court disagrees with my analysis of the merits the
Court should provide respondent an opportunity to file a further brief to raise any procedural defenses
that may be available to respondent.

41, 56, 59-60). Parker described Petitioner as a little bit tired. (T 1/17/08, 42). Parker assured Petitioner that if his mother wasn't there, that he could sleep at her house. (T 1/17/08, 41). Petitioner left between 8:30 and 9:30 p.m. (T 1/17/08, 42, 56).

At about 9:45 p.m., they were sitting on the porch when a black car pulled up and Fella a/k/a Donald Isom3 called Petitioner over. (T 1/17/08, 42-43, 57). According to Parker, Petitioner stepped back, like he was nervous. (T 1/17/08, 42, 57). After his initial hesitation, Petitioner went to Isom's car. (T 1/17/08, 57). They talked. (T 1/17/08, 57). Petitioner returned to Parker's porch. (T 1/17/08, 58). Isom left. (T 1/17/08, 57).

At 10 p.m., Doretha Ransom, who was 22, left work, went home, and picked up Isom, who she had been dating for about 1½ months. (T 1/16/08, 101-106, 156-157, 166-167). Ransom drove a 2003 burgundy Alero. (T 1/16/08, 105). They drove to the liquor store, where Isom purchased gin and pink lemonade, which they drank as they drove. (T 1/16/08, 107-108, 157, 171). At one point, they became stuck in some dirt and were pushed out by Ransom's step-father. (T 1/16/08, 108-110).

According to Vanessa Parker Petitioner returned to her house at 11:30 p.m. (9/17/08, 56). Petitioner left after about 20 minutes without telling Parker what was bothering him. (T 1/17/08, 42-43, 56-57).

At midnight, Nathaniel Smith parted company with Eiland and Bates, leaving them at his sister's home. (T 1/17/08, 68, 100).

Shortly before 2 a.m., Ransom and Isom returned to the liquor store, and Isom purchased more gin and pink lemonade. (T 1/16/08, 109-110, 158-159, 171). They continued to drink and drive. (T 1/16/08, 110, 158-159).

As Isom drove, Ransom was aware that he had a silver gun in his waistband. (T 1/16/08, 134-135, 182-183).

About 30 to 40 minutes after 2 a.m., Ransom believed that she and Isom ran into Petitioner, who was walking alone. (T 1/16/08, 111-112, 158-160). Isom yelled to Petitioner. (T 1/16/08, 160). Petitioner came over to Ransom's Alero. (T 1/16/08, 161).

Isom asked Petitioner about a watch. (T 1/16/08, 112, 161). Petitioner and Isom discussed who had the watch. (T 1/16/08, 113-114). Isom thought it was Dray, but Petitioner reported that Ray "supposedly had it." (T 1/16/08, 113-115). Petitioner told Isom that he would show him where Ray/the watch was. (T 1/16/08, 116, 161-162, 180-181, 185).

Isom was driving. (T 1/16/08, 114). Petitioner got into the back seat behind Isom. (T 1/16/08, 114, 183). Ransom deduced that Isom knew where to drive because Petitioner had given him the name Ray. (T 1/16/08, 162).

Isom asked Petitioner what he was doing on that side of town because he would be in trouble if the right person caught him. (T 1/16/08, 132). Petitioner responded that he kept his gun – a .22 – "on him." (T 1/16/08, 132-134, 136, 175-176, 182-183). Petitioner shared in Isom's gin. (T 1/16/08, 171).

According to Ransom, there was no other discussion in the car between Petitioner and Isom. (T 1/16/08, 162-164). In particular, there was no discussion about robbing Ray. (T 1/16/08, 181).

It took about ten minutes to get to the corner of 4th and Federal Streets. (T 1/16/08, 116-117, 162-163). Petitioner and Isom got out of Ransom's car. (T 1/16/08, 116-117, 163).

At about 5 or 5:30 a.m., Petitioner knocked on Raychan Williams' apartment door. (T 1/16/08, 59, 75, 89). Williams, who was asleep, got up and asked who it was. (T 1/16/08, 59). Petitioner responded that it was "This is Prophet [Petitioner], Bro. Open the door." (T 1/16/08, 60-61, 91-92). Petitioner had been buying drugs from Williams for "a couple of years"; however, he had never bought drugs that early. (T 1/16/08, 61, 92).

Williams, who had his light on outside, went to his barred apartment window and looked out. (T 1/16/08, 57-58, 61-62, 64). Williams saw Petitioner, who was wearing a black hoodie, leaning over the banister with his arms up; Petitioner told Williams that he wanted a 20 – slang for a piece of crack cocaine. (T 1/16/08, 62-63, 73, 75-76, 91-92). Williams told Petitioner that he didn't have any drugs. (T 1/16/08, 63, 92). Petitioner believed Williams was lying and asked to discuss the situation. (T 1/16/08, 64).

As Petitioner did so, Williams saw him glance over. (T 1/16/08, 64, 92). When Williams followed Petitioner's glance, he saw Isom, whom he knew as Fella. (T 1/16/08, 64-65). Isom was wearing a baseball cap, a white T-shirt and blue pants, and was on the other side of Williams' banister with a gun, attempting to hide it behind him. (T 1/16/08, 65-67, 73-74, 93). Upon noticing Williams, Isom pointed a chrome semi-automatic .40-caliber at him, positioning it in front of his chest with his arms extended. (T 1/16/08, 67-71, 90, 93). In turn, Williams jumped away from the window. (T 1/16/08, 68-70, 76, 93).

Williams then heard fleeing footsteps. (T 1/16/08, 71, 76). Either Petitioner or Isom screamed something about a watch. (T 1/16/08, 72, 94-95). Williams heard a gun shot. (T 1/16/08, 71, 73, 94). Williams had not seen Petitioner with a gun. (T 1/16/08, 90). Williams later remembered that, four or five months earlier, Petitioner had sold a watch to another man, and, eventually, Williams had purchased it. (T 1/16/08, 75).

Ransom, who had remained in her Alero during Petitioner and Isom's encounter with Williams, estimated that they returned after being gone about ten minutes. (T 1/16/08, 118, 164, 183).

At that point, Isom continued to drive. (T 1/16/08, 118). Isom bragged to Ransom that Ray said that he would have his watch the next day at 1:00 and "don't shoot." (T 1/16/08, 119-120, 156, 164-166).

Around the time that Isom and Petitioner arrived at Williams' apartment, Bates was leaving Smith's sister's house to go to a motel with Latonya Sack, a friend of his who was visiting from out-of-town and came there to meet him. (T 1/17/08, 68-70, 99-101). At that point, Darnell Eiland was sleeping on the recliner in the living room. (T 1/17/08, 70-71). Eiland, however, woke up and accompanied Bates outside, carrying his .45-caliber with him. (T 1/17/08, 72-73, 100). They left through the back door, which did not have a lock on it. (T 1/17/08, 71-72). Bates assumed that Eiland would secure the house from the inside after Bates left Eiland there alone.

6

(T 1/17/08, 70, 72-73, 82, 100).

After their encounter with Williams, Ransom reported that Petitioner and Isom discussed buying some crack. (T 1/16/08, 121, 166, 168, 182, 185). However, Ransom also testified that to her knowledge – having dated Isom for 1 ½ months – he did not use drugs. (T 1/16/08, 79, 115). Petitioner noted that he had just bought some and acted like he didn't want to buy more. (T 1/16/08, 121-122). Even so, Petitioner directed Isom to North 9th and Johnson Streets. (T 1/16/08, 123-124, 168, 181-182). Isom asked who was there when Petitioner bought his dope. (T 1/16/08, 124). Petitioner replied: "Black Nate [Nathaniel Smith]" and "Coby," among other names. (T 1/16/08, 124-125, 168-169). According to Ransom, there was no discussion about a robbery or robbing a drug house. (T 1/16/08, 169-170, 181). Instead, Isom told Petitioner to buy some dope. (T 1/16/08, 129, 169). Petitioner told Isom that he did not have any money; so, Isom gave him some. (T 1/16/08, 129, 169-170, 185).

Isom stopped in front of a yellow apartment building on Johnson Street. (T 1/16/08, 126-128, 170, 172). Again, Petitioner and Isom left the car while Ransom remained behind, listening to rap music. (T 1/16/08, 130).

Thereafter, Ransom heard 4 or 5 gunshots. (T 1/16/08, 137, 177). They sounded different. (T 1/16/08, 138). The first shot was separated from the remaining ones. (T 1/16/08, 138, 177-178).

Kitty corner from Smith's sister's house, Lee Brooks lived with his wife and three children. (T 1/17/08, 6-8, 14-15). As was his habit, Brooks was up early, ironing his wife's work clothes. (T 1/17/08, 8). Between 5:45 and 6 a.m., Brooks was talking to his wife while ironing her top and they heard gunshots. (T 1/17/08, 9-10, 13, 22). Brooks described hearing six shots. (T 1/17/08, 10-11). He heard pow, pow. (T 1/17/08, 11). Then, he heard another series of shots – boom, boom, boom, pow, boom – before it stopped. (T 1/17/08, 11). There were seconds between them, but there were two different sounds. (T 1/17/08, 11, 22). Brooks described one gun as being louder than the other. (T 1/17/08, 12, 21-22). Brooks went to his front door and looked out, but, even though the area was illuminated by a street light, he didn't see anything on North 9th Street. (T 1/17/08, 13-16, 22-25). Because it was not uncommon for Brooks to hear shots in his neighborhood, he didn't call the police. (T 1/17/08, 17-18, 26).

Peter Kirk lived in the yellow apartment building on the corner of Johnson and North 9th Streets behind Smith's sister's house. (T 1/17/08, 27-28, 34). At about 6 a.m., Kirk, who was sleeping, heard approximately 10 gunshots. (T 1/17/08, 30-31, 37). Again, Kirk reported that it was not unusual to hear gunshots in his neighborhood. (T 1/17/08, 31-32). Like Brooks, Kirk believed that the shots sounded like they came from two different guns. (T 1/17/08, 32). One gun was louder than the other. (T 1/17/08, 32-33). There were four shots, three shots and, finally, three more shots over three minutes. (T 1/17/08, 32-33). The first shots came from the small caliber gun; the second, from the large caliber gun; and, the third, from the small caliber gun. (T 1/17/08, 33). Kirk went back to sleep with his television still on. (T 1/17/08, 31, 34-36).

After hearing the shots, Ransom reported that Petitioner and Isom returned to her car. (T 1/16/08, 139). Petitioner was wearing a black hoodie and Isom was wearing a white T-shirt and blue jeans. (T 1/16/08, 139-140). Isom's hand was bleeding. (T 1/16/08, 140, 178). Isom stated that he was shot, but he continued to drive. (T 1/16/08, 140-141, 178). Petitioner gave Ransom his hoodie to wrap Isom's hand. (T 1/16/08, 143-144, 179).

They drove a short distance before Isom stopped. (T 1/16/08, 143). They all got out of Ransom's Alero. (T 1/16/08, 143). Isom gave Petitioner his gun. (T 1/16/08, 145-146, 179). Petitioner took it. (T 1/16/08, 147).

Isom and Ransom switched positions in her Alero. (T 1/16/08, 143-144, 179). Petitioner walked away after telling Ransom to take Isom to a hospital in Bay City or Flint. (T 1/16/08, 147, 179-180).

Instead, Ransom took Isom to St. Mary's Hospital in Saginaw because he was bleeding and moaning. (T 1/16/08, 147-149). Isom told Ransom to say that she had picked him up on Wadsworth. (T 1/16/08, 148).

At 6:18 a.m., Saginaw City Police Department Officer Sophia Jordan responded to the dispatch about Isom being shot in the left hand. (T 1/17/08, 115-116). Isom didn't say anything about how he was shot, but Ransom told police that she had picked him up on 11th Street. (T 1/16/08, 150; T 1/17/08, 117-118). Officer Jordan left, going back to the police department. (T 1/16/08, 150; T 1/17/08, 118). Once there, Jordan asked her supervisor to take some photographs of Isom's hand. (T 1/17/08, 118-121).

At about 7:30 a.m., Sergeant Brian Lipe went to the hospital and photographed Isom's left hand. (T 1/17/08, 122-124, 135). Isom had two gunshot wounds, one to his ring and pinky fingers and another to the web between his thumb and index finger. (T 1/17/08, 123-124). Although Lipe asked, Isom offered no explanation for his gunshot wounds. (T 1/17/08, 124). Isom, however, provided an address about three blocks from North 9th Street. (T 1/17/08, 127-128).

Later on the morning of Saturday, August 26, 2006, Raychan Williams saw Petitioner again. (T 1/16/08, 76, 79, 95). According to Vanessa Parker, Williams, who lived across the street from her, "came down on fire," in his boxer shorts to confront Petitioner. (T 1/17/08, 44-45, 53, 55).

Williams observed that Petitioner was no longer wearing his black hoodie. (T 1/16/08, 81). When Williams confronted Petitioner, Petitioner told Williams that it wasn't him, and that Isom had made him come over to try to get Williams to open his door. (T 1/16/08, 81, 96). Petitioner claimed that Isom wanted to kick Williams' door in, but Petitioner told him that that wasn't the way it was done. (T 1/16/08, 81, 95-97). According to Petitioner, Isom was going to rob Williams and a couple more people. (T 1/16/08, 82, 96).

Because Williams was a drug dealer, he admitted that he would not have called the police if he had been robbed of his drugs. (T 1/16/08, 98-99). Petitioner assured Williams that he didn't need to worry about Isom anymore because he had been shot. (T 1/16/08, 83). Petitioner reported that he told Isom to go to a Flint hospital. (T 1/16/08, 83).

Williams then received a call about Darnell Eiland. (T 1/16/08, 84-85, 87, 97). Williams lived approximately 3½ blocks south and 4 city blocks west of Smith's sister's house where Eiland's body was found. (T 1/16/08, 23, 55, 78, 98).

Somewhere between 10:15 and 11 a.m., Bates returned to Smith's sister's house on North 9th Street, where he had left Eiland by himself. (T 1/17/08, 70, 104). Bates saw both the glass screen door and the back door wide open, which was unusual. (T 1/17/08, 74, 101-102, 104-105, 112-113). Bates called for Eiland without response. (T 1/17/08, 74-76). Bates went through the kitchen, turned right into the room with the pool table, and, then, into the living room. (T 1/17/08, 75-76). Bates thought that perhaps Eiland had gone to his aunt's house down the street. (T 1/17/08, 76).

Bates turned and was leaving when he noticed shell casings on the kitchen floor because he kicked them. (T 1/17/08, 76, 104-105, 111-112). Bates didn't see any blood. (T 1/17/08, 105). Bates returned to the living room, where he saw Eiland's legs sticking out from behind a couch. (T 1/17/08, 77, 105).

Bates ran over and picked up a glass table top off Eiland's legs. (T 1/17/08, 78-79). Bates grabbed Eiland, rolling him over and asking him to get up. (T 1/17/08, 77-79, 106). Eiland, who had blood on his shirt, didn't respond. (T 1/17/08, 77, 79). Bates kept calling Eiland's name, staying with him for about 10 minutes. (T 1/17/08, 80-81). Eiland's pants were down and his boxers were exposed. (T 1/17/08, 80). According to Bates, Eiland wore his pants baggy and "kept money on him"; however, Bates did not know if Eiland had money on him that day. (T 1/17/08, 103-104, 109).

Bates testified that Eiland's .45-caliber was on the floor, even though at Petitioner's preliminary examination, he had testified that it was in Eiland's right hand. (T 1/17/08, 78-79, 81, 106-108). Bates took Eiland's .45 and left. (T 1/17/08, 79-81, 85, 87-88, 106-107, 110-111).

Bates drove to Smith's house. (T 1/17/08, 81). Bates hid Eiland's .45-caliber in the grass behind Smith's house. (T 1/17/08, 107-109). Bates called 911. (T 1/17/08, 82).

Bates and Smith returned to the North 9th Street house without the .45-caliber. (T 1/17/08, 82-83). Bates took Smith inside to show him Eiland. (T 1/17/08, 83). As they came out of Smith's sister's house and walked down the driveway, the police arrived. (T 1/17/08, 83-84). Neighbors had already gathered. (T 1/17/08, 84).

City of Saginaw Police Department Officers Douglas Wortley and Oscar Lopez responded at about noon, stopping a house or two away. (T 1/16/08, 22-23, 25, 46-47; T 1/18/08, 45, 56-57). They were told that there was a dead man inside. (T 1/16/08, 28; T 1/18/08, 47). They entered the open back door to make sure that no one else was inside. (T 1/16/08, 28-29, 48; T 1/18/08, 47, 51). They went through the kitchen. (T 1/18/08, 47). On the right, they found a room in disarray with a pool table, couches and chairs. (T 1/18/08, 47-48). In what the police described as a second living room, they found Eiland dead in the threshold of a bedroom. (T 1/16/08, 33; T 1/18/08, 47-48). Eiland's pants were down, exposing his boxer shorts. (T 1/16/08, 35, 53). After they determined that no one else was inside, Wortley and

9

Lopez went outside. (T 1/18/08, 49).

Sergeant Lipe, who had earlier photographed Isom's hand wounds, also responded. (T 1/17/08, 125, 130). Lipe went inside. (T 1/17/08, 126). After the paramedics arrived, one of them confirmed that Eiland was dead. (T 1/17/08, 126-128).

Bates talked to the police on-scene and at the station. (T 1/17/08, 84). Bates gave Eiland's .45 to City of Saginaw Police Department Detective Mark Walker. (T 1/17/08, 84-85, 111; T 1/18/08, 28-29, 38, 40, 119-120). Bates went back to the police station and, later, was released. (T 1/17/08, 86; T 1/18/08, 33-34).

Bates denied knowing that there was a cellophane baggie of crack cocaine in a condom box in the bedroom where Eiland's body was discovered. (T 1/17/08, 103-104; T 1/18/08, 52-53, 56-57, 94, 120-121). In fact, the police found no pipes that could be used to smoke the crack cocaine. (T 1/18/08, 58-59). Eiland, however, had marijuana in his pants pocket as well as $32 in his left pants pocket. (T 1/17/08, 103-104, 121-122, 122).

The police found an additional .45-caliber magazine in the bedroom bookshelf. (T 1/17/08, 103; T 1/18/08, 52, 55, 57, 94, 120). To Bates' knowledge, Petitioner never came to the Smith's sister's house and no drugs were sold there. (T 1/17/08, 111, 113-114).

By the time Raychan Williams arrived at Smith's sister's house on North 9th Street, he saw a crowd of friends and family members around the house who were crying. (T 1/16/08, 85-86). The police were there. (T 1/16/08, 86).

Lee Brooks' daughter had also called to tell him about the murder and he called the police. (T 1/16/08, 19). Brooks also went outside and overheard City of Saginaw Police Department Officer Addison Burton asking what time it had happened. (T 1/16/08, 20; T 1/18/08, 6-8). Brooks yelled out that it happened at 6. (T 1/16/08, 20; T 1/18/08, 8)

City of Saginaw Police Department Detective Randy Mudd served as the evidence technician on this case. (T 1/18/08, 60). Mudd collected a .40-caliber Smith & Wesson shell casing from the crack in the sidewalk leading to the back door of the North 9th Street house. (T 1/17/08, 127, 130-131; T 1/18/08, 41-42, 68, 70-72, 77, 84, 110-111).

Inside the porch, Mudd removed a piece of blood-spattered plywood with a bullet hole. (T 1/18/08, 71-73, 76-78, 112-113). There was a bullet hole in the door casing/jamb/frame with blood spatter, which had traveled through into that plywood. (T 1/18/08, 54-55, 57, 73, 76, 78-80, 95, 123; T 1/23/08, 10). Detective Mudd removed the jamb. (T 1/18/08, 122-123). The jamb had a gray area around it, indicative of powder burns and close-range firing. (T 1/23/08, 11). That bullet traveled into a 2'x4' board in the furnace area. (T 1/18/08, 74-76, 81, 90-91; T 1/23/08, 11). Detective Mudd retrieved it. (T 1/18/08, 75, 126-127).

In the home's entranceway, Detective Mudd found a .45-caliber shell casing. (T 1/18/08, 71, 81-82, 84, 113).

On the back of the steel security door, Detective Mudd photographed blood spatter. (T 1/18/08, 69-71, 124-125). There was a shoe imprint impression on the

10

back door near the blood spatter. (T 1/18/08, 69-71; T 1/23/08, 18-19). On the door knob, there was blood spatter. (T 1/18/08, 70-71).

In the kitchen, the police found blood spatter on the wall near the rear door. (T 1/16/08, 37, 39-40, 50; T 1/17/08, 127, 130-132; T 1/18/08, 26, 40-42, 55, 71, 82-83). Again, Detective Mudd removed it. (T 1/18/08, 84-85, 114).

In the furnace area in the kitchen, Detective Mudd found one shell casing and two spent bullets, including one under the furnace. (T 1/16/08, 38-39, 50-51; T 1/17/08, 127, 130-133; T 1/18/08, 26, 41-42, 68-69, 71, 85-87, 114-116; T 1/23/08, 15). The casing was a .40-caliber Smith & Wesson. (T 1/18/08, 87, 113-115).

There was an additional bullet hole in the dining room wall. (T 1/18/08, 88-89, 91-93; T 1/23/08, 10, 15-16). That bullet came from outside. (T 1/18/08, 89-90). Detective Mudd retrieved it. (T 1/18/08, 93, 116; T 1/23/08, 16).

Detective Mudd also photographed blood on the siding just outside the back door by the sidewalk. (T 1/18/08, 93-95).

There were also three areas of the chimney that appeared to have chips out of the brick. (T 1/18/08, 100-101, 104-106; T 1/23/08, 17). Later testing showed that those areas reacted positive for lead. (T 1/18/08, 101-102, 105-106; T 1/18/08, 17-18).

The police expanded the crime scene to the corner of North 9th and Johnson Streets – about ½ block from the North 9th Street address – after finding blood there. (T 1/17/08, 128, 134-135, 138-141; T 1/18/08, 93). Another spot of blood was found on the sidewalk, leading to the yellow house behind the North 9th Street address. (T 1/17/08, 138-141). Detective Mudd collected a stain from the sidewalk area. (T 1/18/08, 93, 118).

In the interim, Vanessa Parker had gone out for breakfast and Petitioner joined her. (T 1/17/08, 41, 46, 49, 52, 55). Petitioner told Parker that he was with Isom, who was going to kill Raychan Williams. (T 1/17/08, 48). Isom wanted Petitioner to draw Williams to the door. (T 1/17/08, 48, 53). Petitioner went upstairs to wake up Williams for a crack sale. (T 1/17/08, 46, 52). Even though Parker never told anyone about Williams having a gun when he came to the door, she testified that Petitioner had told her that. (T 1/17/08, 47-48). Petitioner claimed that Isom forced him to do it. (T 1/17/08, 48-49, 53-54, 60). Petitioner told Parker that he had saved Williams' life. (T 1/17/08, 45, 48, 54). Parker did not hear any shots at Williams' house that morning. (T 1/17/08, 59).

Petitioner further reported that Isom had pulled up as Petitioner was trying to get into his mother's house. (T 1/18/08, 49). Isom wanted Petitioner to take him to the hospital because he had been shot in the hand. (T 1/17/08, 49-51, 54). Petitioner agreed, advising Isom not to go to a Saginaw hospital. (T 1/17/08, 50-51). First, however, Petitioner had to put his gun away. (T 1/17/08, 50-52). Petitioner had been "having a little trouble with other people . . . try[ing] to jump him." (T 1/17/08, 50).

After breakfast, Petitioner went to Parker's house and slept for three hours. (T 1/17/08, 58).

In the interim, Detective Walker went to the scene. (T 1/18/08, 24). Walker

11

conferred with Detective Mudd, who was collecting evidence, and Detective Ruth. (T 1/18/08, 25-26).

At 1:30 p.m., Officer Burton went to the hospital, having been assigned to talk to Isom. (T 1/16/08, 150; T 1/18/08, 8-9). Isom was sleeping and had an IV. (T 1/16/08, 151; T 1/18/08, 9, 12). Burton waited for about an hour until Isom woke up. (T 1/18/08, 9-10). Burton had been told that Isom was going to be discharged as soon as he was awake. (T 1/18/08, 10). Burton's assignment was to take Isom and Ransom to the police department. (T 1/18/08, 10). Burton had already called for an additional officer to transport Ransom while he separately transported Isom. (T 1/18/08, 11).

According to Ransom, Burton talked to Isom, but was called away. (T 1/16/08, 152). At that point, Isom called his sister. (T 1/16/08, 152). When Burton returned, asking who Isom was talking to, the nurse came and Burton left again. (T 1/16/08, 153). Burton, however, only recalled being asked to go to the nurse's station to talk to Detective Bob Ruth. (T 1/18/08, 11).

According to Ransom, after Burton left Isom's hospital room, Isom told Ransom that his sister told him that someone had been killed on 9th Street. (T 1/16/08, 153). Isom asked Ransom to pull out his IV. (T 1/16/08, 153). When she didn't, he pulled it out himself. (T 1/16/08, 154). Isom, who was only in his hospital gown, then went out into the hallway. (T 1/16/08, 154; T 1/17/08, 130).

As Burton was talking to Detective Ruth on the telephone, Officer Diane Meehleder arrived to help him transport Ransom and Isom. (T 1/18/08, 11; T 1/23/08, 145). At that time, Isom walked out of his room with blood dripping from his right hand where his IV had been. (T 1/18/08, 12). Burton told Isom to go back to his room, adding that he would be there shortly. (T 1/18/08, 12). Isom turned, and Meehleder informed Burton that Isom was going down the stairwell. (T 1/18/08, 13). Burton ran to the first floor, finding Isom outside, running. (T 1/18/08, 13). Isom had a head start and Burton asked someone driving by for help. (T 1/18/08, 15-16). Burton eventually cut Isom off. (T 1/18/08, 17-18). Burton yelled for Isom to stop, and believed that he would continue to try to flee, but Isom "was winded" and stopped. (T 1/18/08, 17-18). Other officers took Isom to the police station. (T 1/18/08, 17).

Like Isom, Ransom, too, left the hospital; however, she only made it to the parking lot before being stopped by police. (T 1/16/08, 154-155; T 1/17/08, 129; T 1/18/08, 18).

The police impounded Ransom's Alero. (T 1/17/08, 129-130). And, Detective Mudd later processed it, finding blood. (T 1/18/08, 106-108).

Burton also returned to the hospital to retrieve Isom's clothes. (T 1/18/08, 18). Isom had a camouflage baseball cap, a long-sleeved black T-shirt with a hood, denim jeans and sneakers. (T 1/18/08, 19-20). Isom also had a cell phone, a stick of Double Mint chewing gum and two quarters. (T 1/18/08, 21-22).

Detective Walker interviewed Ransom, who told him about Petitioner. (T 1/18/08, 34-35).

According to Raychan Williams, he told someone about Petitioner and Isom being at his house and the police later contacted him. (T 1/16/08, 87). Williams told

12

the police about what happened, describing the .40-caliber gun. (T 1/16/08, 87, 99).

Detective Ruth, however, testified that Williams then called the police, telling him what had happened earlier in the day. (T 1/23/08, 150-151). Detective Ruth asked Williams to call back if he had any information about where Petitioner was; shortly thereafter, Williams called back to report that Petitioner was at Vanessa Parker's house. (T 1/18/08, 35, 37; T 1/23/08, 146-147, 149-152). The police picked up Petitioner at 6 or 7 p.m. about a block away from Parker's house as he walked in the pouring rain. (T 1/18/08, 36; T 1/23/08, 147, 150, 152). Petitioner didn't have a weapon when he was arrested. (T 1/23/08, 151-152).

Detective Walker obtained buccal swabs from Petitioner and Isom. (T 1/18/08, 31-33).

Doctor Kanu Virani performed Darnell Eiland's autopsy. (T 1/17/08, 145). Eiland was 23 years old, 5' 9" tall and weighed 150 pounds. (T 1/17/08, 147, 158, 171). Eiland's gray T-shirt had a bullet hole in the left front chest and right back. (T 1/17/08, 148-149). There was no evidence of close range firing, indicating that Eiland was shot from a distance of more than 2½ feet. (T 1/17/08, 148, 151-152). Eiland's assailant shot him in the left front chest next to his sternum. (T 1/17/08, 149-150, 153). The bullet traveled through Eiland's heart, right lung, right chest cavity, and out his back. (T 1/17/08, 153-154). Eiland's chest cavities contained approximately ½ his blood. (T 1/17/08, 154, 160-161, 169). Eiland was shot from the left side and the bullet traveled horizontally. (T 1/17/08, 154-155, 171-172).

Dr. Virani opined that once Eiland was shot, he lived for only 30 to 60 seconds. (T 1/17/08, 158-159, 168). Dr. Virani opined that the bullet was anywhere from a .25 to .45-caliber. (T 1/17/08, 155, 170-171).

Dr. Virani also testified that Isom had at least two gun shot wounds to the back of his left hand. (T 1/17/08, 162-163, 165). The first was a wound to the back center of Isom's left hand and the web between his thumb and index finger. (T 1/17/08, 162-163, 165-166). One of them was an entrance wound; the other, an exit wound, but Dr. Virani could not determine which was which. (T 1/17/08, 163). There was also a grazing gun shot wound to Isom's pinky and ring finger. (T 1/17/08, 164). Those wounds could have been made by the same gun, depending on the position of Isom's hand. (T 1/17/08, 165).

The police returned to the North 9th Street house after conducting their interviews. (T 1/18/08, 102-103). They found a bullet hole in the ceiling of the back porch area; the bullet traveled into the roof itself. (T 1/18/08, 98-99, 103-104, 127-129; T 1/23/08, 14). Again, Detective Mudd retrieved it. (T 1/18/08, 104, 127-128).

Michigan State Police Crime Laboratory Sergeant Ryan Larrison was qualified as an expert in firearms. (T 1/23/08, 22-26). The two .40-caliber Smith & Wesson shell casings – one found in the sidewalk crack leading to the 9th Street house and the other found on the kitchen floor – went through the same gun. (T 1/23/08, 35-39, 55, 62). Three of the .40-caliber/.10-millimeter bullets – the one found under the furnace, the one found on the kitchen floor, and the one found in the dining room wall – were all fired by the same gun. (T 1/23/08, 39-43, 58-59). Those bullets were copper jacketed, meaning that their lead core was covered; however, the

13

jacketing could be stripped, leaving the lead core, if it hit glass, sheet metal or cement. (T 1/23/08, 59-60).

The bullet recovered from the 2'x4' was a .38-caliber or .9-millimeter. (T 1/23/08, 44-46, 54-55).

The .45-caliber belonging to Eiland fired the .45-caliber bullet recovered from the back porch ceiling and .45-caliber shell casing found on the threshold of the 9th Street house's back door. (T 1/23/08, 46-50, 53-54).

Sergeant Larrison opined that at least 3 different firearms were involved. (T 1/23/08, 49, 51).

Detective Mudd searched the 9th Street address and Williams' apartment for additional shell casings using a metal detector, but found none. (T 1/18/08, 130; T 1/23/08, 8-9, 19). Detective Mudd and Sergeant Larrison agreed that shell casings could be moved, kicked away, or stuck in the treads of tires. (T 1/23/08, 19, 61). Detective Mudd and Sergeant Larrison both noted that a revolver, as opposed to an automatic or semi-automatic weapon, would not eject a shell casing. (T 1/23/08, 19, 45-46).

Detective Mudd also executed a search on Isom's house, which was on South 9th Street, finding only proof of residency. (T 1/18/08, 129; T 1/23/08, 148).

Petitioner's house was also searched but no guns or anything else of evidentiary value was found. (T 1/23/08, 148).

Michigan State Police forensic scientist Valerie Bowman was qualified as an expert in biological stain identification and blood spatter analysis. (T 1/23/08, 64-67). The plywood from the kitchen had two areas of human blood stains on it. (T 1/23/08, 69-71). The swabs from the back of the security door had human blood on it. (T 1/23/08, 73-74). The swabs from the sidewalk on Johnson near North 9th Street had human blood on them. (T 1/23/08, 73-74). The swabs from Ransom's car had human blood on them. (T 1/23/08, 73-74). Unsurprisingly, Eiland's T-shirt, pants and boxer shorts had blood on them. (T 1/23/08, 75).

Bowman also found possible blood on the fired .40-caliber bullet found on the kitchen floor; however, there was not enough to confirm that it was human blood and perform DNA testing. (T 1/23/08, 81-82, 96). On that same fired bullet was "a whitish smear" – characteristic of possible paint. (T 1/23/08, 83). The fired bullet found under the furnace also tested presumptive for blood. (T 1/23/08, 82, 96). Again, it had "a whitish smear" and "some fibrous material," which Bowman thought might be a spider's web. (T 1/23/08, 83, 96-97). The bullet recovered from the dining room wall had white chunky material on it, possibly drywall, and a white smear, possibly paint. (T 1/23/08, 83-84, 97). The bullet recovered from the 2'x4' had brownish fibers on its nose, like wood; but, again, Bowman did not perform a confirmatory test. (T 1/23/08, 84, 97). Finally, the .45-caliber bullet recovered from the roof had possible wood fibers on its nose. (T 1/23/08, 84, 97).

The plywood from the back porch area had three areas of blood (T 1/23/08, 85-86). It had high velocity blood from a gunshot or high speed machinery on it; it was also consistent with someone being shot in the hand. (T 1/23/08, 86-88, 91-92, 98-100). There were two areas of castoff staining on the plywood, consistent with

blood being swung or thrown from a bloody hand. (T 1/23/08, 88-89, 100). Finally, there was a contact stain made from a bloody item coming into contact with it or the wall being bloody and something which was not bloody moving through it. (T 1/23/08, 89-90).

On the kitchen drywall, there was an area of medium velocity impact blood; however, Bowman could not rule out that that stain originated from a gunshot. (T 1/23/08, 91, 101-102). That blood stain was not caused by gravity. (T 1/23/08, 101).

Michigan State Police forensic scientist Lauren Stanchek was qualified as an expert in DNA analysis. (T 1/23/08, 104-107). She determined that the high velocity blood and the cast off stain from the back porch's plywood matched Isom's DNA profile. (T 1/23/08, 126-127, 134). The statistical probability of that profile in the African-American population was 1 in 225 quadrillion. (T 1/23/08, 135-136).

The blood spatter on the kitchen drywall also matched Isom's DNA profile. (T 1/23/08, 129).

The DNA on the .40-caliber spent bullet found under the furnace had insufficient information to include Darnell Eiland as contributing the male DNA thereon, but Petitioner and Isom were excluded as contributing it. (T 1/23/08, 130-132, 139-142).

Not surprisingly, the blood on Darnell Eiland's T-shirt matched his DNA profile with a random statistical probability of 1 in 13 quintillion in the African-American population. (T 1/23/08, 132-133, 136).

Petitioner's DNA was on none of the items tested. (T 1/23/08, 140).

Petitioner chose not to testify. (T 1/23/08, 155-156).

After deliberating, the jury convicted Petitioner of second-degree murder, felon-in-possession, carrying a concealed weapon and felony-firearm. (T 1/29/08, 48-52). Petitioner's jury acquitted him of felony-firearm as to the second-degree murder, attempted armed robbery of Eiland and its accompanying felony-firearm, felony-firearm as to the attempted armed robbery of Raychan Williams, and felony-firearm as to the conspiracy to commit armed robbery. (T 1/29/08, 48-49). Petitioner's jury hung on the charges of attempted armed robbery as to Raychan Williams and conspiracy to commit armed robbery. (T 1/29/08, 48-52).

Answer, at 3-22 (footnotes omitted).

C.    *Concurrent Sentencing Doctrine*

Respondent first argues that the Court should decline to consider petitioner's sufficiency of the evidence claim under the concurrent sentencing doctrine, because petitioner was sentenced to concurrent sentences of the same length as his sentence on the murder conviction with respect to his firearms convictions.  Under the "concurrent sentencing doctrine," a "court may decline to hear

a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction." *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989); *see also*, *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992). The doctrine is a discretionary one, *see Hughes*, 964 F.2d at 541, and courts "are admittedly hesitant to apply this doctrine." *Dale*, 878 F.2d at 935 n.3; *see also*, *Winn v. Renico*, 175 Fed. Appx. 728, 732 (6th Cir. 2006).. The doctrine is applicable only "when there is *no possibility* of adverse 'collateral consequences' if the convictions stand." *Winn*, 175 Fed. Appx. at 732 (emphasis added); *see also*, *Dale*, 878 F.2d at 935 n.3; *Wilson v. Straub*, 185 F. Supp. 2d 766, 769 (E.D. Mich. 2002) (Hood, J.). The Court should presume that petitioner's conviction carries adverse collateral consequences, *see Wilson*, 185 F. Supp. 2d at 769-70 (citing *Sibron v. New York*, 392 U.S. 40, 55 (1968)); *see also*, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that the Court generally presumes that a criminal conviction carries adverse collateral consequences beyond the sentence imposed), and respondent bears a heavy "burden of showing that the risk of collateral consequences is too slight to justify review." *Suarez v. Bennett*, 207 Fed. Appx. 114, 115 (2d Cir. 2006). The concurrent sentence doctrine is not jurisdictional–that is, the existence of concurrent sentences does not render a challenge to one sentence moot and therefore outside the Court's jurisdiction. *See United States v. Williams*, 128 S. Ct. 1830, 1838 n.1 (2008); *Benton v. Maryland*, 395 U.S. 784, 791 (1969).

As noted in *Dale*, there must be "*no* possibility of adverse 'collateral consequences'" before the concurrent sentencing doctrine will be applied. *Dale*, 878 F.2d at n.3 (emphasis added). Here, it cannot be said that there is *no* possibility of adverse consequences. There is a possibility, however slight, that petitioner's other convictions here will no longer result in his imprisonment.

16

For example, although it seems unlikely, this conviction may be overturned in state postconviction proceedings, or by a federal court through a writ of habeas corpus or a writ of error corum nobis. Likewise, the existence of these multiple convictions may implicate petitioner's suitability for parole.

Prior to adoption of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996), such slight possibilities of collateral consequences could be adequately accounted for by dismissing the petition pursuant to the concurrent sentencing doctrine, but making such a dismissal without prejudice to the petitioner refiling his or her application should the unlikely collateral consequences occur. For example, this was the course taken by the court in *Scott v. Louisiana*, 934 F.2d 631, 635 (5th Cir. 1991). However, even if this Court were to take the approach of the *Scott* court, application of the concurrent sentencing doctrine to petitioner's application will have the effect of forever precluding petitioner from challenging this conviction, even if the greater sentence is commuted or otherwise becomes invalid, due to the one year limitations period of the AEDPA.  28 U.S.C. § 2244(d)(1). Accordingly, the Court should decline respondent's invitation to apply the concurrent sentence doctrine.

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

17

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of

18

whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.   *Sufficiency of the Evidence/Innocence*

Petitioner raises three claims which implicate the sufficiency of the evidence presented by the prosecution. First, he contends that the trial court erred in denying his motion to quash because there was insufficient evidence presented at the preliminary examination to warrant binding him

over on the charge of first degree murder. Second, he contends that the prosecution presented insufficient evidence to sustain his conviction for second degree murder. Finally, he contends that he is actually innocent of the charges against him. The Court should reject each of these claims.

1.   *Bind Over*

Relying on the argument asserted in his state court brief, petitioner contends that he was improperly bound over on the charge of first degree felony murder because no evidence was presented at the preliminary examination that the killing of the victim occurred during the commission of a robbery. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

First, petitioner's bind-over claim is not cognizable on habeas review. There is no general constitutional right to a preliminary examination before trial. *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.26 (1975); *Harris v. Neil*, 437 F.2d 63, 64 (6th Cir. 1971). Thus, a state court's failure to even hold a preliminary examination does not present a cognizable habeas claim. *See Scott v. Bock*, 241 F. Supp. 2d 780, 793 (E.D. Mich. 2003) (Lawson, J.). Similarly, therefore, a claim that the evidence offered at a preliminary examination was insufficient for a finding of probable cause is not cognizable on habeas review. *See David v. Lavinge*, 190 F. Supp. 2d 974, 978 (E.D. Mich. 2002) (O'Meara, J.). Further, it is an "established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein*, 420 U.S. at 119 (citing *Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886)). Thus, "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Gerstein*, 420 U.S. at 119. Because petitioner is now incarcerated pursuant to a valid conviction, he cannot

20

challenge the preliminary procedures employed prior to his trial.

Second, petitioner cannot show that he was prejudiced by his bind over on the first degree murder charge and the submission of that charge to the jury, because the jury acquitted him of the first degree murder charge.   Although, as discussed below, the Supreme Court has clearly established that it is a due process violation to *convict* a defendant on a charge for which there is insufficient evidence, "the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge."   *Long v. Stovall*, 450 F. Supp. 2d 746, 752 (E.D. Mich. 2006) (Gadola, J.); *see also*, *Thomas v. Bell*, No. 2:06-13165, 2008 WL 268892, at *5 (E.D. Mich. Jan. 29, 2008) (Borman, J.); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 761-62 (E.D. Mich. 2004) (Cleland, J., adopting Report of Majzoub, M.J.).   The acquittal on the greater charge renders the submission of that charge harmless.   *See Long*, 450 F. Supp. 2d at 752; *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001) (Tarnow, J.).

Finally, even if petitioner's bind-over claim is cognizable, there was sufficient evidence of premeditation to support the bind-over.   The prosecution's burden at the preliminary examination stage is not onerous.   As the Michigan Court of Appeals has explained:

> A district court must bind over where the prosecutor has presented competent evidence sufficient to support probable cause to find both that a felony was committed and that defendant committed it. [*People v. Northey*, 231 Mich.App. 568], 574-575, 591 N.W.2d 227 [(1998)]. The prosecutor is not required to prove all elements of the offense charged at the preliminary hearing, but must only produce evidence sufficient for a finding of probable cause. "Probable cause to believe that the defendant committed the crime is established by a reasonable ground of suspicion, supported by circumstances sufficiently strong to warrant a cautious person in the belief that the accused is guilty of the offense charged." *People v. Woods*, 200 Mich. App. 283, 288, 504 N.W.2d 24 (1993). "Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to justify binding over a defendant." *Id.*

21

*People v. Cervi*, 270 Mich. App. 603, 616, 717 N.W.2d 356, 364 (Mich. Ct. App. 2006); *see also*, *People v. Grayer*, 235 Mich. App. 737, 744 n.3, 599 N.W.2d 527, 531 n.3 (Mich. Ct. App. 1999). "Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *People v. Justice*, 454 Mich. 334, 344, 562 N.W.2d 652, 657 (1997). As the Michigan Court of Appeals reasoned, the prosecution presented evidence at the preliminary examination which provided probable cause to believe that the killing of the victim occurred during the commission of a robbery. Specifically, one "witness testified at the preliminary examination that [petitioner] and Isom had appeared at his home with a gun on the night in question and appeared to be attempting to rob him. The witness further noted that [petitioner] later told him that Isom wanted to rob a few people that night." *Phillips*, 2009 WL 3049727, at *2. This testimony was sufficient to provide "a reasonable ground of suspicion" that the killing of the victim occurred during the commission of a robbery. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.    *Sufficiency of the Evidence*

Petitioner next contends that the prosecution presented insufficient evidence to support his conviction for second degree murder. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a.  *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

It is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.3d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979); *United States v.*

23

*Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. Second degree murder consists of four elements: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without lawful justification or excuse. *See People v. Smith*, 478 Mich. 64, 70, 731 N.W.2d 411, 414-15 (2007) (citing *People v. Goecke*, 457 Mich. 442, 464, 579 N.W.2d 868 (1998)). "Some evidence must be presented regarding each element of the crime or from which those elements may be inferred." *People v. Goecke*, 457 Mich. 442, 470, 579 N.W.2d 868 (1998) (citing *People v. Doss*, 406 Mich. 90, 100-01, 276 N.W.2d 9 (1979)).

In order to show malice, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). The prosecution may establish the elements of a crime through circumstantial evidence that creates a reasonable inference that an element is satisfied. *See Kelly v. Jackson*, 353 F. Supp.2d. 887, 891

24

(E.D. Mich. 2005) (citing *People. v. Goecke*, 457 Mich. 442, 463-64, 579 N.W.2d 868 (1998)).  As the Supreme Court has explained:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result.  Yet this is equally true of testimonial evidence.  In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference.  In both, the jury must use its experience with people and events in weighing the probabilities.  If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland v. United States*, 348 U.S. 121, 140 (1954).

Further, MICH. COMP. LAWS § 767.39 abolished the common law distinction between aiders and abettors and principals, and provides that aiders and abettor may be prosecuted and convicted as though they had directly participated in the crime.  *See People v. Palmer*, 392 Mich. 370, 378, 220 N.W.2d 393, 396 (1974).  Aiding and abetting under Michigan law requires proof of three elements: (1) commission of the underlying crime whether by the defendant or some other person; (2) acts or encouragement by the defendant which aided or assisted the commission of the crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant that the principal intended to commit the crime at the time aid or encouragement was given.  *See People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1986) (per curiam).

### *b.  Analysis*

The Michigan Court of Appeals rejected petitioner's sufficiency of the evidence claim, reasoning:

> Here, a reasonable juror could have readily concluded from the trial evidence that the shot that killed Eiland could only have been fired by one of two people: Isom or defendant.  The prosecutor was not required to establish that defendant pulled the trigger; so long as evidence was presented that defendant knew Isom had a gun and was willing to kill.  The prosecutor met this burden by presenting a witness who testified that defendant said Isom was going to kill another man that had been the victim of an attempted robbery earlier that night.  From this testimony a reasonable

25

> juror could have concluded that defendant had the intent to do an act in obvious
> disregard of life-endangering consequences, or that he aided and abetted Isom in
> committing such an act, with knowledge of Isom's intent.

*Phillips*, 2009 WL 3049727, at *3. This determination was reasonable. At trial, Ransom's testimony established that the victim was killed either by Isom or petitioner. There was also evidence presented that at least three different guns were involved in the shooting, suggesting that petitioner himself fired shots in the home where the victim was killed. Williams testified that, earlier that evening, petitioner and Isom appeared at his door, and that Isom was armed and pointed his gun at Williams, subsequently firing a shot. And Parker testified that petitioner told her the morning after the shooting that he knew that Isom wanted to kill Williams. From this evidence, a rational juror could have concluded, beyond a reasonable doubt, that at a minimum petitioner gave assistance to Isom and knew that Isom intended to kill or act in obvious disregard for the life-endangering consequences of his acts at the time petitioner gave the assistance.

Petitioner contends that the insufficiency of the evidence is shown by the fact that the jury either acquitted or was unable to reach a unanimous verdict on the charges of first degree murder, conspiracy to commit armed robbery, attempted armed robbery, and related felony-firearm charges. All this shows, however, is that the jury did not believe, or did not unanimously believe, that the murder occurred during the commission or attempt to commit an armed robbery; it is not inconsistent with a finding that petitioner murdered the victim or aided and abetted Isom in doing so. It does not imply, as petitioner argues, that the jury "clearly weighted and discredited the witness testimony specifically (Vanessa Parker) which the prosecution relies upon to support Petitioner's knowledge of the alleged intent to kill." The jury could have believed Parker's testimony, but concluded that it did not suffice to establish the elements of robbery. Or, the jury could have

26

credited some portions of Parker's testimony and rejected others, as it was free to do.  *See United States v. Ware*, 577 F.3d 442, 447 (2d Cir. 2009).   Or the jury may have simply reached a compromise verdict.  As explained above, the question on habeas review is whether the evidence presented at trial, viewed in the light most favorable to the prosecution, was sufficient for any rational juror to conclude that the elements of the offense were proved beyond a reasonable doubt.  This review does not authorize a reviewing Court to divine the thought processes of the jurors in reaching their verdict.  "Even if [the Court] assume[s] that the jury's verdict is inconsistent or is the result of a compromise, this is not cause for speculation or inquiry into the verdict on [the Court's] part."  *United States v. Kohlmann*, 491 F.2d 1250, 1253 (5th Cir. 1974); *see also*, *United States v. Powell*, 469 U.S. 57, 62-69 (1984); *Dunn v. United States*, 284 U.S. 390, 393-94 (1932); *United States v. Opare-Addo*, 486 F.3d 414, 416 (8th Cir. 2007) (citation omitted) ("[W]hen considering what are characterized as inconsistent verdicts, . . . we only ask whether the government presented sufficient evidence to support the conviction.  We are reluctant to delve into the minds of the jurors to determine the reasons for apparently inconsistent verdicts.").

Because the Michigan Court of Appeals reasonably concluded that the prosecution presented sufficient evidence that petitioner committed, or aided Isom in committing, second degree murder, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.      *Innocence*

Finally, in his reply brief, petitioner contends that he is actually innocent of the crimes for which he was convicted.  To the extent petitioner is attempting to raise his innocence as a separate claim for relief, the claim is without merit.

A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in

custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id.* at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), overruled in part on other grounds, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief.

Further, even were such a claim cognizable, petitioner has failed to establish his actual innocence. In order to be entitled to the actual innocence exception to overcome a procedural bar, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). Here, petitioner has pointed to no new evidence in support of his innocence claim; rather, he merely contends that the evidence presented at trial was insufficient. Accordingly, petitioner is not entitled to habeas relief on his actual

innocence claim.

F.      *Notice of the Charges*

In his reply brief and his motion to vacate, petitioner contends that he was deprived of his right to a fair trial because he was not provided with sufficient notice of the charges against him. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that a criminal defendant has the right to "be informed of the nature and cause of the accusation" against him. U.S. CONST. amend VI. Notice and an opportunity to defend against the charges as guaranteed by the Sixth Amendment are an integral part of the due process protected by the Fourteenth Amendment, and are accordingly applicable in state prosecutions. *See Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *In re Oliver*, 333 U.S. 257, 273 (1948). The complaint or indictment challenged need not be perfect under state law so long as it adequately informs the petitioner of the crime in sufficient detail so as to enable him to prepare a defense. Thus, "[a]n indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986); *see also*, *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982); *Ransom v. Davis*, 613 F. Supp. 430, 431 (M.D. Tenn. 1984), *aff'd*, 767 F.2d 921 (6th Cir. 1985). "[A] charge is sufficiently specific when it contains the elements of the crime, permits the accused to plead and prepare a defense, and allows the disposition to be used as a bar in a subsequent prosecution." *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992).

2.      *Analysis*

*a. Aiding and Abetting Murder*

Petitioner first contends that the information failed to give him notice that he was being charged with murder as an aider and abettor, instead only charging that he and Isom "did, while in the perpetration or attempted perpetration of a robbery, murder one Darnell Leroy Eiland." However, as discussed above in connection with petitioner's sufficiency of the evidence claim Michigan law expressly abolished the distinction between principals and aiders and abettors. *See* Mich. Comp. Laws § 767.39. And the Michigan Supreme Court has long held that a person may be convicted of aiding and abetting even though the information charges him only as a principal. *See People v. Mann*, 395 Mich. 472, 476-77, 236 N.W.2d 509, 511 (1975) (discussing *People v. Wright*, 90 Mich. 362, 51 N.W. 517 (1892); *People v. McKeighan*, 205 Mich. 367, 171 N.W. 500 (1919)). "[T]he giving of an aiding and abetting instruction does not violate due process where the state has abolished the distinction between principals and accessories, and where there is evidence before the jury to support the instruction." *Quigg v. Crist*, 616 F.2d 1107, 1111 (9th Cir. 1980). Here, "[u]nder state law, a general charge of murder gives a defendant adequate notice that he could be prosecuted under aiding and abetting liability." *Donaghe v. Galaza*, 4 Fed. Appx. 338, 340-41 (9th Cir. 2001). As another court has explained, "[i]n Michigan, there is no distinction between principals and accessories. As a result, aiding and abetting is an alternative theory of guilt on a direct charge. Because 'he who aids and abets is [also] a principal,' a defendant charged as a principal is on notice that, if the evidence indicates he was an accessory to others, he may be convicted on the direct charge as an aider/abettor." *Mosby v. Burt*, No. 5:05-cv-61, 2007 WL 1467258, at *22 (W.D. Mich. May 18, 2007); *see also*, *McLemore v. Bell*, No. 2:07-CV-11340, 2010 WL 1247550, at *12 (Feb. 16, 2010) (Pepe, M.J.), *magistrate judge's report adopted*, 2010 WL 1247555 (E.D. Mich.

Mar. 25, 2010) (Zatkoff, J.); *cf. United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992) (under federal law, "[a]iding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit," and thus "[a]bsent a showing of unfair surprise, it is not an abuse of discretion to give an aiding and abetting instruction."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Firearms Charges

Petitioner also contends that he lacked notice of the felon-in-possession charge because that count of the information charged that he "did possess and/or use and/or carry and/or transport a firearm when ineligible to do so." Petitioner contends that because the information did not specify which particular act–possession, use, carrying, or transportation–he committed, it did not provide him notice of the charges. Petitioner also raises a similar argument with respect to the other firearms charges, which also charge alternative actions. The Court should reject this claim.

It is well established that a charging document need not give "notice of the exact method by which the criminal actions were alleged to have been committed." *Martin v. Kassulke*, 970 F.2d 1539, 1543 (6th Cir. 1992). The federal courts "have consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973); *see also*, *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (internal quotation omitted) ("[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."). As the Supreme Court has explained, it is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully,

31

directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).

Here, the information charged the various firearms offenses using the language of the relevant statutes. The alternative activities which could form the basis of the charges, for instance possession, use, carrying, or transporting, are sufficiently similar activities that the failure of the information to specify one particular activity did not result in a lack of notice to petitioner of the charges he was facing. And, in any event, the information did not fail to provide notice, but provided notice that he was charged with each activity prohibited by the statute. It is well established that "where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (internal quotation omitted). Contrary to petitioner's argument, such language facilitates notice by "adequately appris[ing] the defendant of the government's intention to charge him under any prong of the statute." *Id*. at 727 (internal quotation omitted). Thus, petitioner had adequate notice that he was charged under each prong of the various firearms statutes charged in the information, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Sentencing*

Finally, petitioner contends that the trial court improperly scored two offense variables under the Michigan sentencing guidelines. A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal

habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored or departed from the guidelines range raises issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Thus, petitioner is not entitled to habeas relief on his claims relating to the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

H.      *Evidentiary Hearing*

Finally, petitioner has filed a motion for an evidentiary hearing. In his motion, petitioner seeks a hearing to develop evidence to show that his counsel was constitutionally ineffective, and to show that he is actually innocent. The Court should deny petitioner's motion.

In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254; and (2) is a hearing is permitted under 28 U.S.C. § 2254(e)(2). Petitioner's request for an evidentiary hearing fails on both bases. First, with respect to necessity, in deciding whether an evidentiary hearing is necessary under Rule 8, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim."

*Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also*, *Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law); *cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).  As the Supreme Court recently explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.
> It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citations and footnote omitted).

Here, an evidentiary hearing is not necessary to resolve petitioner's claims.  With respect to actual innocence, as noted above such a claim is not cognizable on habeas review, and thus an evidentiary hearing would not have the potential to advance his claims.  With respect to ineffective assistance of counsel, petitioner does not raise any ineffective assistance claims in his petition or reply, nor did he raise any such claims in the Michigan courts.  Thus, development of evidence with respect to counsel's performance would not have the potential to advance any of the claims that are actually before the Court.  Further, petitioner provides a list of seven ways in which counsel was ineffective, but provides no further detail.  For example, petitioner contends that counsel was ineffective for failing to call witnesses, but does not identify any such witness or state their purported testimony.  Similarly, he contends that counsel failed to adequately raise issues in a timely fashion, but fails to specify what those issues were.  The habeas rules "do[] not . . . authorize fishing expeditions.  A habeas petitioner must make sufficiently specific factual allegations; conclusory

34

allegations will not suffice to mandate either discovery or a hearing." *Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir. 1996); *see also*, *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006). Petitioner's "'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring . . . an evidentiary hearing.'" *Washington*, 455 F.3d at 733 (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)).

Further, even assuming an evidentiary hearing were otherwise necessary under Rule 8, one is not permitted by § 2254(e)(2). Pursuant to 28 U.S.C. § 2254(e)(2), "[i]f the applicant has failed to develop the factual basis of the a claim in State court proceedings, the court shall not hold an evidentiary hearing on a claim unless" one of two exceptions is met. 28 U.S.C. § 2254(e)(2). Here, an evidentiary hearing is not permissible because petitioner has "failed to develop the factual basis" of his ineffective assistance claim in the state courts. In *Michael Williams v. Taylor*, 529 U.S. 420 (2000),[4] the Court explained that Congress' use of the term "'failed to develop' implies some lack of diligence[.]" *Id.* at 430. Thus, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. Under Michigan law, to develop the factual basis of his claims based on matters outside the record petitioner was required to file a motion for a new trial and evidentiary hearing in the trial court or a motion to remand for that purpose in the court of appeals. *See People v. Ginther*, 390 Mich. 436, 443-44, 212 N.W.2d 922, 925 (1973); *People v. Gray*, 125 Mich. App. 482, 486, 336 N.W.2d 491, 493 (1983). Here,

---

[4]This case should not be confused with the *Williams v. Taylor* case discussed in part C, *supra*, in which the Court explained the standard of review under § 2254(d). Although both cases bear the same caption and were decided on the same date, the petitioners differed in the two cases. For clarity, I refer to the case discussing § 2254(e)(2) by the petitioner's full name–"Michael Williams"–rather than just by "Williams" as is the ordinary citation convention. *See Watkins v. Miller*, 92 F. Supp. 2d 824, 828 n.1 (S.D. Ind. 2000) (taking same approach).

petitioner did not file a motion for new trial or for an evidentiary hearing in the state courts to develop any ineffective assistance of counsel claims.  Nor did he file a motion for relief from judgment in accordance with MICH. CT. R. 6.500-.508 and attempt to develop the facts in connection with that proceeding.  Because petitioner did not seek a hearing in accordance with state law, he did not diligently attempt to develop the factual basis of his claim in state court and therefore he is not entitled to an evidentiary hearing here.  *See Michael Williams*, 529 U.S. at 437 (§ 2254(e)(2) diligence requires "that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."); *Smith v. Bowersox*, 311 F.3d 915, 921 (8th Cir. 2002) (petitioner's "failure to comply with [state] law reflects a lack of diligence.").

Because an evidentiary hearing is not necessary under Rule 8 nor permissible under § 2254(e), the Court should deny petitioner's motion for an evidentiary hearing.[5]

I.    *Recommendation Regarding Certificate of Appealability*

1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S.

---

[5]Because an evidentiary hearing is neither necessary under Rule 8 nor permissible under § 2254(e), the Court need not consider whether an evidentiary hearing would have any utility in light of the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding that, with respect to any claim adjudicated on the merits to which § 2254(d) applies, the federal court's review is limited to the record that was in existence at the time of the state court decision).

880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory

37

committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

      2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  As explained above, it is clear that petitioner's improper bindover, actual innocence, and sentencing claims do not provide a cognizable basis for habeas relief.  Thus, the resolution of these claims is not reasonably debatable.  Further, in light of the evidence presented at trial, and the deferential standard of review mandated by both § 2254(d) and *Jackson v. Virginia*, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable.  Finally, because the information charging petitioner as a principal was sufficient under state law to provide him notice that he was also being charged as an aider and abettor, and because the firearms charges merely charged alternative means of committing the violations, the resolution of petitioner's notice claims is not reasonably debatable.  Accordingly, the Court should deny petitioner a certificate of appealability.

J.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus, and should deny his motions to vacate and for evidentiary hearing.  If the Court accepts this recommendation, the Court should also deny petitioner

a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 9/8/11

39

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on September 8, 2011.

s/Eddrey Butts
Case Manager